ELECTRONIC

**Mar 22 2006**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

Case No. 05-80825-Civ-COHN/SNOW

| | |
|---|---|
| ALPHANSO MITCHELL, *et al*., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| OSCEOLA FARMS CO., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OF LAW IN SUPPORT
## OF PLAINTIFFS' MOTION FOR DISQUALIFICATION
## OF DEFENDANT'S COUNSEL

In recent weeks, Osceola's principal attorney handling this case, Robert C.L. Vaughan of

Squire Sanders & Dempsey LLP ("Squire Sanders"), has contacted several of the Plaintiffs in

Jamaica, personally or through a representative, without the consent of the Plaintiffs' counsel or

approval by the Court.   The Plaintiffs believe that these actions seriously violate applicable

ethics rules and warrant the disqualification of Mr. Vaughan and Squire Sanders from continuing

as counsel for Osceola in this litigation.

1

## FACTS UNDERLYING THE PRESENT MOTION

### The claims

The Plaintiffs are migrant farmworkers, most of who currently reside in Jamaica or other Caribbean nations.  This case arises out of their work cutting sugar cane for Defendant Osceola Farms Co. ("Osceola") during the 1987-88 through 1992-93 harvest seasons.   The 1597 Plaintiffs contend that Osceola breached its work contracts with the cane cutters by paying less than the promised wage rate.

One of the Plaintiffs' core claims is that Osceola failed to pay the cane cutters the federally-mandated adverse effect wage rate ("AEWR") for their work.  *See* Amended Complaint ¶ 18.[1]   Although they were compensated on a "task rate" or "piece rate," based on the volume of cane they harvested, the cane cutters were guaranteed, both by their contracts and by federal regulations, wages at least equal to the AEWR for each pay period. *See* 20 C.F.R. § 655.102(b)(9)(ii)(A).  If the worker's pay period earnings based on the "task rate" exceeded the amount due under the hourly AEWR, the worker would receive the "task rate" wages.  Otherwise, Osceola was required to pay the worker the amount due under the AEWR for the pay period, forcing the company to supplement or "build up" the cutter's task rate earnings to the level required by the AEWR.

---

[1]The AEWR is an hourly rate computed annually by the Department of Labor and is equal to the weighted average hourly wage for crop and livestock workers in the state.  Throughout most of the years encompassed by this litigation, the AEWR for Florida was $5.30 per hour, although it rose somewhat beginning in 1991.

## Role of the pushers (leadmen) and ticket writers

The Plaintiffs contend that Osceola avoided most of its liability for "build up" pay by under-reporting the cane cutters' hours of work on the company's daily time records. These records were initially prepared by the supervisors assigned to each crew, who were known as "pushers" (or "leadmen") or "ticket writers."   The Plaintiffs allege that in an effort to reduce the amount of "build up" pay, the pushers and ticket writers on a daily basis "balanced" the record of hours worked against the cutter's daily task rate earnings.  Under this practice, if a man earned $30 in task rate wages, there would be no "build up" owed at the $5.30 AEWR so long as the man was credited with 5 or fewer hours.  Under this scheme, the worker would be credited with only 5 hours, even though he may have worked far more hours during that day.[2]

The former pushers and ticket writers obviously are important witnesses with respect to the cane cutters' wage claims.  To date, six former crew supervisors have been deposed in this case.   Each of the six acknowledged that the records on his crew included instances of "balancing" hours in an effort to limit the amount of "build up" pay.

## Ticket writers as cane cutter Plaintiffs

Most of the pushers and the ticket writers were West Indian guest workers who had originally worked as cane cutters and were later elevated to supervisory roles based on their ability to perform simple mathematics.   Three of the six former ticket writers who have been

---

[2]This sort of manipulation of records of the time worked is commonly used by agricultural employers who compensate their workers on a piece-rate basis as a means of avoiding minimum wage liability.  .*See, e.g., Wales v. Jack M. Berry, Inc.*, 192 F.Supp.2d 1269, 1277 (M.D. Fla. 2000) (employer's records "matched hours to bins picked").

3

deposed are also Plaintiffs in this action because prior to assuming their supervisory roles, they had worked as cane cutters themselves during the six-year period encompassed by this litigation.[3]

## The improper contacts

Over the past few months, without permission from or notice to the Plaintiffs' counsel, Squire Sanders has contacted at least three other Plaintiffs who also worked as ticket writers or pushers as well as cane cutters.[4]      Attorney Robert Vaughan of Squire Sanders met directly with Plaintiff Patrick Muirhead on or about March 9, 2006.  This interview was scheduled several days earlier by a "Mr. Ashley," working on behalf of Squire Sanders.[5]   Throughout this meeting, Muirhead was unaware that Vaughan represented Osceola.  Vaughan questioned Muirhead regarding his work as a ticket writer and pusher, including the practice of "balancing" hours.   Vaughan completed the interview and left without ever informing Muirhead that he was counsel for Osceola.

        Squire Sanders' representative, presumably "Mr. Ashley," also met with at least two other named Plaintiffs.   Approximately three weeks ago, a man came to the home of Plaintiff Sedley Ramsay to speak with him regarding the case.  The visitor told Ramsay that he was

---

[3]These three are Leon Luke, Alton Brown and Eric Russell.

[4]The Plaintiffs' counsel are aware of three Plaintiffs who have been contacted (Delroy Morgan, Patrick Muirhead and Sedley Ramsay).   However, Osceola's counsel has declined a request to provide a list of the Plaintiffs it has contacted, so the number could be considerably larger.
[5]"Mr. Ashley" is probably Earl Ashley, one of the principals of Ashchar Consultants, Ltd of Kingston, Jamaica.  Attorney Vaughan had used Ashchar's services in an earlier case against another sugar grower and had engaged Ashchar to assist in locating witnesses in this case.   *See* Vaughan letter of March 10, 1999 (Exhibit 1) and Ashchar invoice of February 20, 2006 (Exhibit 2).

4

working on the court case involving the cane cutters and stated that he was contacting a number

of people regarding the litigation.  The visitor obtained Ramsay's telephone number and told him

that someone would be contacting him with further information regarding the case in the future.

Ramsay showed the visitor a letter he had received from his lawyers at the Migrant Farmworker

Justice Project.  Upon seeing the letter, the visitor responded that he had been sent to visit

Ramsay by the same organization that had written him the letter.  Plaintiff Delroy Morgan was

also visited by a man who identified himself as "Mr. Ashley."   Ashley scheduled an

appointment for Morgan to meet with an unidentified individual to discuss this case.  At no time

was Morgan informed that Ashley was acting on behalf of Osceola or its counsel.

## Squire Sanders' attempted justification of the contacts

Squire Sanders never informed the undersigned of these or any other substantive contacts

it had with the named Plaintiffs in this action.  The Plaintiffs' counsel only learned of these visits

by Squire Sanders on March 10 during the course of telephone calls with these former cane

cutters in preparation for their upcoming depositions.   Counsel for the Plaintiffs immediately

wrote Squire Sanders, pointing out the apparent ethical violation and demanding an explanation

for these visits.   Counsel for the Plaintiffs also sought a list of all of the Plaintiffs who had been

contacted, as well as notes and memoranda relating to these contacts.

Squire Sanders responded with two separate letters, dated March 14 and March 16.   Both

letters acknowledged the contacts with the Plaintiffs, but defended them as permissible and

appropriate.   Squire Sanders also declined to provide a list of the Plaintiffs contacted or the

notes and memoranda relating to these contacts.[6]

Squire Sanders' arguments as to the propriety of the contacts were set out in some detail

in the March 16 correspondence, authored by Joseph Klock, a senior attorney at Squire Sanders.

Four reasons were offered for the firm's actions.  First, Squire Sanders argued that because they

had at various times worked as crew supervisors, the Plaintiffs contacted by the firm could not

be plaintiffs because they were not members of the cane cutter classes in the previous state court

action against Osceola.  Second, Squire Sanders posited that because these Plaintiffs may have

participated in the unlawful "balancing" of the payroll records, they were ineligible to be

plaintiffs in this action and therefore barred from seeking any relief for the time they worked as

cane cutters themselves.  Third, Squire Sanders contended that the firm may have inadvertently

confused the individuals it contacted with other workers with identical or similar names.

Finally, Squire Sanders claimed that it had "never dawned on [the firm] that a Leadman or

Ticket Writer would or could be a plaintiff in this action."

## ARGUMENT

### I.  Squire Sanders violated  the non-contact rule.

The Rules of Professional Conduct prohibit a lawyer from communicating "about the

subject of the representation with a person the lawyer knows to be represented by another lawyer

in the matter, unless the lawyer has the consent of the other lawyer."  Rule 4-4.2(a), Rules

---

[6]Copies of Squire Sanders' March 14 (Exhibit 3) and March 16 (Exhibit 4) letters are attached to
this memorandum.

Regulating the Florida Bar, as adopted by this Court in S.D. Fla. Local Rule 11.1C.  *See also* Fl.

Ethics Op. 88-4, April 15, 1988 (when a lawyer inserts himself into the attorney client

relationship between his adversaries, he has improperly interjected himself into that relationship,

in violation of his ethical duties).   Squire Sanders' actions in contacting named Plaintiffs in this

case falls squarely within this prohibition.[7]

Squire Sanders is wrong in contending that its behavior falls outside the rule is wrong.

Squire Sanders emphasizes that these individuals could not possibly be plaintiffs in this case

because at various points during the relevant period they served as pushers or ticket writers.  *See*

Squire Sanders letter of March 16.  However, the rule does not prohibit contact with persons who

are properly before the court as parties.  Instead, the rule applies to all contact with a represented

individual.  For purposes of the ethical provision, it matters not whether the claims of these

Plaintiffs are properly before the Court.  The only relevant inquiry is whether these men are

represented by counsel.

There can be no doubt that these men are represented in this case.  Their names appear on

the caption of this case as plaintiffs, with their counsel plainly identified, and as such these

---

[7] This Court has the authority to enforce the ethical rules regulating the Bar in accordance with its duty to protect the integrity of the attorney-client relationship and the adversarial process, through its supervision of the  members of its Bar. *Kleiner v. First National Bank of Atlanta,* 751 F.2d 1193, 1209 (11th Cir.1985); *Papanicolaou v. Chase Manhattan Bank,* 720 F.Supp. 1080, 1083 and 1084 (S.D.N.Y.1989)**.**  *See also*, ABA Formal Op. 97-408 (Rule 4.2 "'provide[s] protection of the represented person against overreaching by adverse counsel, safeguard[s] the client-lawyer relationship from interference by adverse counsel, and reduce[s] the likelihood that clients will disclose privileged or other information that might harm their interests,'"*citing* ABA Formal Op. 95-396.)

Plaintiffs were "represented" for purposes of the ethical rule. *Faison v. Thornton*, 863 F.Supp. 1204, 1213 (D. Nev. 1993) (a party is "represented" when he has counsel of record).[8]

Squire Sanders' argument that "it never dawned" on the firm that a pusher or ticket writer could be a plaintiff is untenable. At the time of these contacts, Osceola had already participated in the depositions of three Plaintiffs who both cut cane and later served as pushers or ticket writers. *See, e.g.,* Deposition of Herman Campbell, January 12, 2006 at p. 11 (Squire Sanders acknowledges that former ticket writer Alton Brown was a plaintiff in this action); Deposition of Alton Brown, January 13, 2006 at pp. 6, 10 and 61-62 (while participating in Brown's deposition because of his status as a plaintiff, Squire Sanders chooses not to attend deposition of former ticket writer George Larmond, because, unlike Brown, he was not a plaintiff in the case).[9]

In its March 16 letter, Squire Sanders also suggests that it might have been confused as to whether the individuals it contacted were in fact the same persons as named in the complaint. ("there is no way of telling, by the simple iteration of a first and last name, whether an individual is not named in the complaint.")   While it is true that some of the cutters shared the same name, that cannot be said of the names of the three Plaintiffs with respect to whom improper contact was made (Delroy Morgan, Patrick Muirhead and Sedley Ramsay).  Furthermore, if Squire Sanders was uncertain as to the status of these individuals, it should have checked with the Plaintiffs' counsel or sought the Court's guidance prior to contacting them. *See, Faison*, 863 F.Supp. at 1216 ("a reasonable and prudent attorney would have telephoned opposing counsel as

---

[8]Squires Sanders was fully aware that these individuals were plaintiffs in the case, serving interrogatories upon them, referring to each of them as a "plaintiff." (Exhibit 5).

[9]Excerpts of the relevant portions of the depositions of Alton Brown (Exhibit 6) and Herman Campbell (Exhibit 7) are being filed in conjunction with this motion.

a precautionary measure or at least conducted some legal research" prior to contacting an

opposing party); *Cagguila v. Wyeth Laboratories, Inc.*, 127 F.R.D. 653, 654 (E.D. Pa.

1989)("[i]n such an uncertain area of ethical conduct, we believe that a prudent attorney would

have given notice to opposing counsel of the intent to take such a statement"); *U.S. v. Eckerd

Corporation*, 35 F.Supp.2d 896, 897 (M.D. Fla. 1999) (court approval sought).

## II. Squires Sanders should be disqualified for its violation of the no-contact rule.

  While a party's right to be represented by counsel of choice is important, this right "must

yield...to considerations of ethics which run to the very integrity of our judicial process." *Hull v.

Celanese Corp.*, 513 F.2d 568, 572 (2d.Cir. 1975).  It is the court's duty to maintain the integrity

of the judicial system and even the appearance of an impropriety may require disqualification.

*McPartland v. ISI Investment Services, Inc.*, 890 F.Supp. 1029, 1032 (M.D. Fla. 1995).  *See also

MMR/Wallace Power & Industrial v.Thames Associates*, 764 F.Supp. 712, 726-28 (D. Conn.

1991) (disqualification of law firm is necessary to protect the adversarial process based on a

lawyer's ex parte contact with a former member of the adversary's litigation team);

*Papanicolaou v. Chase Manhattan Bank*, 720 F.Supp. 1080, 1083-1084 (S.D.N.Y. 1989)

(disqualification of defendant's attorney warranted after private conversation between attorney

and plaintiff in which he disparaged plaintiff's counsel); *Kleiner v. First National Bank of

Atlanta*, 751 F.2d 1193, 1209 (11th Cir. 1985), *citing National Hockey League v. Metropolitan

Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (attorney disqualified for secret solicitation of

requests for exclusion from class in violation of class notice and protective order;

disqualification is appropriate to penalize the conduct warranting the sanction and to deter those who might "be tempted to such conduct in the absence of such a deterrent").

The "no contact" rule is essential to the integrity of the judicial process. It protects against a client making unwise statements to opposing counsel and against potentially compromising his lawyer's tactics. *Papanicolaou*, 720 F.Supp. at 1083.  For this reason, disqualification is an appropriate sanction for violations of the "no contact" rule, because such ethical breaches threaten the confidentiality of the attorney-client relationship and impugn the adversarial process. *See, Papanicolaou*, 720 F.Supp. at 1083-1084; *Inorganic Coatings, Inc. v Falberg*, 926 F.Supp.517, 521 (E.D.Pa.1995) (attorney disqualified for ex parte communications with opposing party who was represented by counsel)[10].

While disqualification is a severe sanction, it is appropriate in this case because of the history of violation of the "no contact" rule by Squire Sanders and the need to deter future violations. *See Kleiner*, 751 F.2d at 1209 (disqualification warranted to deter those who might "be tempted to such conduct in the absence of such a deterrent.")   This is not the first time attorney Vaughan has faced a complaint of violating the "no contact" rule with respect to Jamaican cane cutters.  In 1999, shortly after his admission to practice, Vaughan was working with Steel, Hector & Davis, which in August, 2005 merged with Squire Sanders.  Vaughan assisted in the litigation of *Bernard Bygrave, et al., v. Sugar Cane Growers Cooperative, Inc., et al.*, Case No. CL-89-8690-AI (Fla. 15th Jud. Cir.), the class action suit that originally included the claims against Osceola that are now before this Court.  In the *Bygrave* case, Vaughan sent

---

[10]In addition to the specific prohibition of the no-contact rule, lawyers must avoid even the appearance of impropriety.  *See State Farm Mut. Auto. Ins. Co. v. K.A.W.*, 575 So.2d 630, 633 (Fla.1991); *McPartland v. ISI Investment Serv., Inc*., 890 F.Supp. 1029, 1030-31 (M.D.Fla.1995).

letters to various members of the class of cane cutters and met with at least one of them.[11]

Vaughan's conduct in *Bygrave* was the subject of a complaint filed with the Florida Bar, the

results of which have not been publicly disclosed.[12]

The entire firm of Squire Sanders should be disqualified because it is likely that

confidential information Vaughan and his representatives gained through their improper contacts

has been shared with other members of the firm. Such sharing is routinely presumed to have

occurred in cases involving attorneys who switch sides in a case or who have been involved in

some significant way on each side of the litigation.  *See McPartland,* 890 F.Supp. at 1031-32 ;

*State Farm Mutual Automobile Insurance Co. v. K.A.W.,* 575 So.2d 630 (1991) (confidential

information acquired during course of prior representation); *Hull,* 513 F.2d at 572 (counsel and

firm disqualified when firm took on as a client a lawyer for the opposing party).

---

[11]According to Vaughan's letter (Exhibit 1), his firm hired Ashchar Consultants in 1999 to assist with the improper contacts with the cane cutters, the same consulting firm Vaughan and Squire Sanders employed for similar work in this case.

[12]In the prior case, Vaughan and his firm defended his actions based upon his inexperience, the rush of preparing for trial, the limited nature of his discussions with the plaintiffs and a misunderstanding on his part regarding whether or not the plaintiffs' counsel had implicitly agreed to such contact.  The affidavit Vaughan filed in *Bygrave* indicated he was well aware  of his ethical responsibilities in regard to avoiding communications with represented plaintiffs, stating that he understood "that I was not to speak to members of the plaintiff class."  Affidavit of Robert C.L. Vaughan, March 31, 1999 (Exhibit 8) at ¶ 3.   Based upon Vaughan's previous admission that "some specifically identifiable impropriety did occur," this court can and should "order disqualification based solely on past improprieties without regard for future taint affecting the outcome of the proceeding."and "the likelihood of public suspicion" or obloquy outweighs the social interest which will be served by a lawyer's continued participation in a particular case." *Kleiner*, 751 F.2d at 1210.

11

### III.  Alternatively, even if Squire Sanders is not disqualified,
### sanctions are needed to ensure that the firm
### does not benefit from the improper contacts with the Plaintiffs.

Regardless of whether Squire Sanders is disqualified, the firm should not be permitted to benefit from the information it obtained in violation of ethical rules.  *See, e.g., Papanicolaou*, 720 F.Supp. at 1087-1088. (relinquishment of work product and deletion of deposition testimony ordered); *Inorganic Coatings,* 926 F.Supp at 520-521 (sanctions for circumvention of discovery proceedings in order to gain unfair advantage included production of notes and memoranda from ex parte communications).   Squire Sanders should be directed to turn over all notes, memoranda, transcripts and other records from the contacts with any of the Plaintiffs, including contacts made through a representative.

### CONCLUSION

Squire Sanders has violated the letter and spirit of the Rules of Professional Responsibility by contacting represented the Plaintiffs in this action, without the consent of their counsel and without the permission of this Court.  These violations were serious in nature and threaten to taint the process going forward.  In light of the gravity of these violations and the firm's history of such improper contacts in the sugar cane litigation, Squire Sanders should be disqualified from representing Osceola in this action and limited to sharing with Osceola's new counsel only the work product and other information developed or discovered before the date on which the improper contact with the Plaintiffs took place.  In addition, Squire Sanders should be directed to turn over to the Plaintiffs all notes and memoranda relating to these improper contacts.  Finally,

the Court should award the Plaintiffs the costs and attorney fees associated with this motion.

*See Kleiner*, 751 F.2d at 1199, 1208-09 (11th Circuit upholds district court order awarding costs

and attorney's fees ordered with respect to successful motion for disqualification); *Faison*, 863

F.Supp. at 1221.

Respectfully submitted,

**/s/ Gregory S. Schell**
Gregory S. Schell
Florida Bar Number 287199
MIGRANT FARMWORKER JUSTICE PROJECT
508 Lucerne Avenue
Lake Worth, Florida   33460-3819
Telephone:      (561) 582-3921
Facsimile:      (561) 582-4884
e-mail:  Greg@Floridalegal.Org

**/s/ Margaret E. Hennessy**
Margaret E. Hennessy
Admitted *pro hac vice*
MIGRANT FARMWORKER JUSTICE PROJECT
508 Lucerne Avenue
Lake Worth, Florida   33460-3819
Telephone:      (561) 582-3921
Facsimile:      (561) 582-4884
e-mail:  mehenness@yahoo.com

13

*/s/ David L. Gorman*
David L. Gorman
Florida Bar Number 222453
DAVID L. GORMAN, P.A.
618 U.S. Highway One, Suite 303
North Palm Beach, Florida 33408
Telephone:      (561) 842-0808
Facsimile:      (561) 842-0914
e-mail:  DLGorman@Bellsouth.Net


*/s/ James K. Green*
James K. Green
Florida Bar Number 229466
222 Lakeview Avenue, Suite 1630
West Palm Beach, Florida 33401-6145
Telephone:      (561) 659-2029
Facsimile:      (561) 655-1357
e-mail:  JamesKGreen@Bellsouth.Net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the foregoing has been furnished

by facsimile transmission and by first class United States mail, postage prepaid, to Robert C.L.

Vaughan of Squire, Sanders & Dempsey, LLP, counsel of record for Defendant Osceola Farms

Co., 200 S. Biscayne Boulevard, Suite 4000, Miami, Florida  33131-2398, this 22nd day of

March, 2006.


*/s/ Gregory S. Schell*
Gregory S. Schell

14

**Robert C.L. Vaughan**
*Attorney Admitted in Florida*

15 Caledonia Avenue
Kingston 5, Jamaica W.I.

(876) 929-6680/6681/6682

RECEIVED MAR 2 2 1999

March 10, 1999

Lloyd (Green)
~~Stanley Brown~~
~~Cornwall Mountain~~ Luipoker Dnsl'd
Westmoreland
Dear Mr ~~Brown~~ (Green)

My name is Robert Vaughan and I am an attorney working in Florida on the sugar cases involving the farms where you worked on the farm-worker program. You may have heard from me through messages or even spoken to me in the past few months regarding these cases currently pending in Florida.

We would like to take more information from you in a more formal setting than in the other conversations we may have had in the past. We would like to speak to you on Sunday, March 14, 1999 at the Terra Nova Hotel. I have asked Mr. Nugent Palmer of Ashchar Consultants, the bearer of this letter to explain to you all the necessary details. We will make all the necessary arrangements for transportation, meals and accommodations for one night for you. You will be picked up Sunday morning between 7 and 9 am. Please let Mr. Palmer know if there will be a problem so that I may make every effort to find a solution.

I thank you for your co-operation and wish you all the best for the future.

Sincerely,

Robert C.L. Vaughan, Esq.



| | | |
|---|---|---|
| INVOICE # : | H2005/089 | |
| INVOICE TYPE: | DEPOSIT | |
| INVOICE DATE: | Feb 20, 06 | |
| RELATED TO INVOICE #: | | |
| GCT #: | 001-683-055 | |

| CLIENT INFO | | CREDIT INFO | |
|---|---|---|---|
| COMPANY: | Squire Sanders & Dempsy | CLIENT #: | 060220 |
| CONTACT: | Robert Vaughan | CREDIT FACILITY: 7 days | |
| ADDRESS: | 427 Spanish Town Rd, Kgn 11 | PURCHASE ORDER #: | |
| TELEPHONE: | 923 7231 | PAYMENT TERMS:  7 days | |
| FAX / PAGER: | 937 0339 | | |

| ASHCHAR PRODUCT | DETAILS | UNIT PRICE | # OF UNITS/ COMMISSION (%) | TOTAL ($) |
|---|---|---|---|---|
| Logistics | Professional Fees | 2,500.00 | 1 | 2,500.00 |
| Cordination | Booking & logistics locations for depositions | 100.00 | 6 | 600.00 |
| | Room Rental Charges | | | |
| | - Pegasus - 2/13 | 352.63 | 1 | 352.63 |
| | - Hotel Versailles - 2/14 | 157.33 | 1 | 157.33 |
| | - Golf View Hotel - 2/15 | 196.67 | 1 | 196.67 |
| | - Rose Hall Resort & Country Club - 2/20 | 324.75 | 1 | 324.75 |
| | - Rooms on the Beach - 2/21 | 236.00 | 1 | 236.00 |
| | - Rio Vista - 2/22 | 196.67 | 1 | 196.67 |
| | Transportation - 2/14 - 2/23 | 2,725.00 | 1 | 2,725.00 |
| Research | Location of Ticket Writers | 100.00 | 35 | 3,500.00 |

| | | |
|---|---|---|
| Rush Charges | | |
| SUB-TOTAL | | 10,789.04 |
| GCT | | 1,780.19 |
| TOTAL | | 12,569.23 |
| DEPOSIT | 60% | 7,541.54 |
| PLEASE PAY | | 7,541.54 |
| BALANCE | | 5,027.69 |

Notes
This invoice is reflective of the agreement between the client and ASHCHAR CONSULTANTS Limited
The payee (indicated above) agrees to pay for time and material used should the job be cancelled prior to completion
Deposit represents a confirmation which is non-refundable
If the amount indicated above, is not paid within 15 days of agreed period, client agrees to 5% per month on the unpaid
balance and further agrees to pay all costs of collection including, but not limited to legal fees
PLEASE MAKE ALL CHEQUES PAYABLE TO ASHCHAR CONSULTANTS LTD
If there are any queries concerning this invoice, please contact the Administrative Department



LEGAL
COUNSEL
WORLDWIDE

SQUIRE, SANDERS & DEMPSEY L.L.P.
*Including*
STEEL HECTOR & DAVIS LLP

200 South Biscayne Boulevard, Suite 4000
Miami, Florida 33131-2398

Office: +1.305.577.7000
Fax: +1.305.577.7001

Robert C. L. Vaughan
rvaughan@steelhector.com
305.577.7078

March 14, 2006

*Via Telefax and U.S. Mail*

David L. Gorman, Esq.
Bay Pointe Building, Suite 303
618 U.S. Highway One
North Palm Beach, FL 33408

     Re:    ***Mitchell v. Osceola Farms Co.***
            **Case No. 05-80825-CIV-COHN/SNOW**

Dear David:

      Thank you for the courtesy of your enquiry dated March 13, 2006. It is appreciated.

      We do not believe we have contacted any plaintiffs in this case. The only people that the defendant has attempted to contact, are those individuals listed in Osceola's amended initial disclosures as "Third Party Witnesses" or "individuals named in depositions" or in Osceola records as "Leadmen" or "Ticket writers." You will note that these are the same people listed as leadmen/ticket writers in Osceola's 1999 response to plaintiffs' Fourth Interrogatory Requests. It is the defendant's understanding that these leadmen and ticket writers were not a part of the class in state court and therefore, as a matter of law, can not be plaintiffs in this action. Please let me know if you have a different understanding.

      This is an important matter for both of us since we would clearly not purposefully attempt to contact your clients, either directly or indirectly – and you understandably wish to maintain your client confidences. So, to ensure that there is absolutely no problem going forward, please review Osceola's amended initial disclosures – specifically, items 1(b) and 1(c) – – and advise us of any listed individuals that you believe are properly plaintiffs in this action. Based upon your letter, it appears that you expect that there is overlap which we never anticipated as the ticket writers and leadmen were *never* part of the initial plaintiff class in state court.

SQUIRE, SANDERS & DEMPSEY L.L.P.
*Including*
STEEL HECTOR & DAVIS LLP

STEEL
HECTOR
&DAVIS
INTERNATIONAL

David L. Gorman, Esq.
March 14, 2006
Page 2

Please call me as soon as you review this letter so that we can resolve this quickly. Obviously, to err on the side of caution, we will not be speaking to anyone else until you and I speak. I am available for most of today, Tuesday, March 14, 2006, to talk to you. I await your prompt response.

Yours truly,

Robert C. L. Vaughan, P.A.

Cc: William Killian
    Joseph P. Klock, Jr.

MIAMI/4160065.1

SQUIRE, SANDERS & DEMPSEY L.L.P.
Including
STEEL HECTOR & DAVIS LLP

200 South Biscayne Boulevard, Suite 4000.
Miami, Florida 33131-2398

Office: +1.305.577.7000
Fax: +1.305.577.7001
Joseph P. Klock, Jr.
JKlock@steelhector.com
305.577.2877

SQUIRE | LEGAL
SANDERS | COUNSEL
| WORLDWIDE

March 16, 2006

*Via Telefax and U.S. Mail*

David L. Gorman, Esq.
Bay Pointe Building, Suite 303
618 U.S. Highway One
North Palm Beach, FL  33408

Re: *Mitchell v. Osceola Farms Co.*
Case No. **05-80825-CIV-COHN/SNOW**

Dear David:

When we first received your letter dated March 13, 2006 to Robert Vaughan, we took it to be a genuine attempt to clarify and if possible, amicably resolve a possible error on our part as defense counsel. Since you chose not to return Robert's telephone call from March 14, 2006, which was a follow-up to his return letter to you of the same date, we assumed that you did not wish to amicably resolve this matter.

As a starting point, it is not our intention to ignore anyone's status as a plaintiff in this suit or as your client. However, to be a plaintiff in this suit, an individual has to have been a member of the decertified class for the years 1987 to 1991 or, for now, a member of the alleged but uncertified class from 1991 to 1993. Unless each plaintiff qualified as such, they cannot be a plaintiff in this lawsuit.

Second, no one can be a plaintiff in this lawsuit if they are implicated as an alleged "wrong-doer" in the complaint, as it is not possible to represent someone suing themselves or suing Osceola as a result of their own actions in whole or in part.

Third, there is no way of telling, by the simple iteration of a first and last name, whether an individual is or is not named in the complaint. Over the years, you have become well aware, as have we, that many men shared the same name on the program.

Fourth, we have used the very same list of lead men and ticket writers that was provided to you several years ago and which was again disclosed in this case in the defendant's amended initial disclosures. It never dawned on us that a Leadman or Ticket Writer would or could be a plaintiff in this action.

CINCINNATI • CLEVELAND • COLUMBUS • HOUSTON • LOS ANGELES • MIAMI • NEW YORK • PALO ALTO • PHOENIX • SAN FRANCISCO • TALLAHASSEE • TAMPA • TYSONS CORNER
WASHINGTON DC • WEST PALM BEACH | CARACAS • RIO DE JANEIRO • SANTO DOMINGO | BRATISLAVA • BRUSSELS • BUDAPEST • LONDON • MADRID • MILAN • MOSCOW
PRAGUE • WARSAW | BEIJING • HONG KONG • SHANGHAI • TOKYO | ASSOCIATED OFFICES: BUCHAREST • BUENOS AIRES • DUBLIN • KYIV • SANTIAGO
www.ssd.com

SQUIRE, SANDERS & DEMPSEY L.L.P.
*Including*
STEEL HECTOR & DAVIS LLP

David L. Gorman, Esq.
March 16, 2006
Page 2

We have only attempted to contact those men who are listed as ticket writers or lead men in the disclosed lists, as those individuals could/should not be members of your group of plaintiffs as they were not and could not be members of the class.

We understand your point that we could have simply looked at "the style of the case." However, since we did not believe we were dealing with cutters, or "former class members" there was no reason to check the "case style" because it never even occurred to us that any of these men -- all former leadmen and ticket writers from the disclosed lists -- were your plaintiffs. As far as we were concerned, these men were not former cutters, were not members of the class and therefore were not your clients.

As we indicated in our earlier letter to you, this is a serious matter to us as well as we have no intention of violating our ethical duties as lawyers on this case. In that vein, since your initial letter, we double checked on those names that you indicated in your letter, were "clients" that were contacted. Our records show that Patrick Muirhead and Sedley Ramsay were leadmen from 1987 through to 1993. This means that they were never cutters during the years in question, they were never class members in the state court action and simply, cannot be your clients here. It seems that Morgan was in fact a leadman only from 1990 through to 1993. This took him out of the class in the state court action as he was clearly adverse to the other plaintiffs in that action. Your second letter, dated March 14, 2006, says different. Even so, none of these men were indicated as class members in the initial state court action and were listed as third party witnesses with knowledge of relevant facts in Osceola's 1999 Response to your Fourth Interrogatory Request. There was no objection then and there has been no objection to the list here.

Further, we cannot understand how you purport to represent people who are on the other side of the fence from the workers who have named some of these very ticket writers and lead men in some informal conspiracy to "cheat them of hours." Again, to hearken back to the *Bygrave* case, that is exactly how the case was presented then -- pitting worker against ticket writers and the company -- and seems to be the case strategy here as well. Yet in this case, you purport to represent the men who were "cheated" and the men who allegedly "cheated" them.

If you have a genuine concern, let us address it to the Court at the status conference where we can have true pictures of who you represent and who are indeed true "third party witnesses." This will also give everyone a chance to determine the plaintiff status of all of these folks, as well as to determine who exactly; by address, passport or other I.D. designation, each plaintiff is, how they came to be plaintiffs and whether they expressed an interest in becoming plaintiffs. We can also determine whether they authorized their names to be placed upon the complaint and the writing that supports that decision, and whether they were ever properly informed of their rights to intervene or bring a suit in their own names, along with the responsibilities that flow with that participation in a lawsuit. We can also determine whether

*Including*
STEEL HECTOR & DAVIS LLP

David L. Gorman, Esq.
March 16, 2006
Page 3

they are being named as plaintiffs in this case those who were not members of the decertified classes —who obviously cannot be plaintiffs now-16 years in the making.

Meanwhile, we will be happy to maintain our notes, internal memos, etc, and hope that you do the same. Obviously, no one wants to infringe upon any ethical concerns-you or us. At the same time, respectfully, you cannot purport to include plaintiffs not part of the traditional claims in this lawsuit-especially ones that have been identified as company agents over the years.

Very truly yours,

Joseph P. Klock, Jr.

cc: William Killian
    Robert C. L. Vaughan P. A.

MIAMI/4160165.2

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

Case No.: 05-80825-CIV-COHN/SNOW

ALPHONSO MITCHELL, *et al.*

      Plaintiffs,

      v.

OSCEOLA FARMS CO,

      Defendant.

_____/

## OSCEOLA FARMS COMPANY FIRST SET OF INTERROGATORIES TO DELROY MORGAN

      Defendant Osceola Farms Co., ("Osceola") propounds the following interrogatories upon Plaintiff Delroy Morgan and requests that they be answered separately, fully and under oath within thirty (30) days of service pursuant to Fed. R. Civ. P. 33.

### DEFINITIONS

      (a)    The words "you," "yours" and/or "yourselves" means plaintiff and, agents, representatives or other persons acting, or purporting to act, on behalf of plaintiff.

      (b)    The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" means "including without limitation".

      (c)    "Date" shall mean the exact date, month and year, if ascertainable or, if not, the best approximation of the date (based upon relationship with other events).

      (d)    "Agent" shall mean any individual, corporation, proprietorship, partnership, trust, association or any other entity.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

Case No.: 05-80825-CIV-COHN/SNOW

ALPHONSO MITCHELL, *et al.*

      Plaintiffs,

      v.

OSCEOLA FARMS CO,

      Defendant.

_____/

## OSCEOLA FARMS COMPANY FIRST SET OF INTERROGATORIES TO PATRICK MUIRHEAD

      Defendant Osceola Farms Co., ("Osceola") propounds the following interrogatories upon Plaintiff Patrick Muirhead and requests that they be answered separately, fully and under oath within thirty (30) days of service pursuant to Fed. R. Civ. P. 33.

## DEFINITIONS

      (a)     The words "you," "yours" and/or "yourselves" means plaintiff and, agents, representatives or other persons acting, or purporting to act, on behalf of plaintiff.

      (b)     The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" means "including without limitation".

      (c)     "Date" shall mean the exact date, month and year, if ascertainable or, if not, the best approximation of the date (based upon relationship with other events).

      (d)     "Agent" shall mean any individual, corporation, proprietorship, partnership, trust, association or any other entity.

MIAMI/4155978.2

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

Case No.: 05-80825-CIV-COHN/SNOW

ALPHONSO MITCHELL, *et al.*

    Plaintiffs,

    v.

OSCEOLA FARMS CO,

    Defendant.

_____/

## OSCEOLA FARMS COMPANY FIRST SET OF INTERROGATORIES TO SEDLEY RAMSAY

    Defendant Osceola Farms Co., ("Osceola") propounds the following interrogatories upon Plaintiff Sedley Ramsay and requests that they be answered separately, fully and under oath within thirty (30) days of service pursuant to Fed. R. Civ. P. 33.

### DEFINITIONS

    (a)    The words "you," "yours" and/or "yourselves" means plaintiff and, agents, representatives or other persons acting, or purporting to act, on behalf of plaintiff.

    (b)    The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" means "including without limitation".

    (c)    "Date" shall mean the exact date, month and year, if ascertainable or, if not, the best approximation of the date (based upon relationship with other events).

    (d)    "Agent" shall mean any individual, corporation, proprietorship, partnership, trust, association or any other entity.

MIAMI/4155978.2

1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2

 3               WEST PALM BEACH DIVISION

 4            CASE No.05-80825-CI-COHN/SNOW

 5
     ALPHONSO MITCHELL, et al.,
 6
             Plaintiffs,
 7   -vs-

 8   OSCEOLA FARMS COMPANY,

 9            Defendant.
     _____
10

11

12            DEPOSITION OF ALTON BROWN

13
                 Friday, January 13, 2006
14                  9:03 - 10:14 a.m.

15

16

17                 17 Da Costa Drive
                   Ocho Rios, Jamaica
18

19

20

21   Reported By:
     Jeana Ricciuti, RPR
22   Notary Public, State of Florida
     Esquire Deposition Services
23   West Palm Beach Office   Job #13033

24

25
```

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

2

```
 1   APPEARANCES:

 2   On behalf of the Plaintiffs:

 3        DAVID L. GORMAN, ESQUIRE
          DAVID L. GORMAN,P.A.
 4        618 US Highway One
          Suite 303
 5        North Palm Beach, Florida  33408
          Phone: 561.842.0808

 6


 7


 8   On behalf of the Defendant:

 9        ROBERT C. L. VAUGHAN, ESQUIRE
          JAVIER LOPEZ, ESQUIRE
10        SQUIRE, SANDERS & DEMPSEY, LLP
          200 South Biscayne Boulevard
11        Suite 4000
          Miami, Florida  33131
12        Phone: 305.577.7000

13

14

15

16

17

18

19

20

21

22

23

24

25
```

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

3

```
1                          -  -  -

2                       I N D E X

3                          -  -  -

4

5   WITNESS:          DIRECT    CROSS   REDIRECT   RECROSS

6
    ALTON BROWN
7

8   BY MR. GORMAN        4
    BY MR. VAUGHAN                17
9   BY MR. GORMAN                          58

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

561.659.4155  ESQUIRE DEPOSITION SERVICES  800.330.6952

4

```
 1              P R O C E E D I N G S

 2                     - - -

 3       Deposition taken before Jeana Ricciuti, Registered

 4  Professional Reporter and Notary Public in and for the

 5  State of Florida at Large, in the above cause.

 6                     - - -

 7  Thereupon,

 8                  (LEON LUKE)

 9  having been first duly sworn or affirmed, was examined

10  and testified as follows:

11                  DIRECT EXAMINATION

12  BY MR. GORMAN

13       Q.   Mr. Brown, as I've explained to you, I'll be

14  asking you some questions, and this young lady is going

15  to take down every word you say and every word I say and

16  every word that Mr. Vaughan here, who represents

17  Osceola, says.  So it's important that you speak up

18  loudly enough for her to hear you and understand.

19       A.   Okay, sir.

20       Q.   Would you tell us your full name.

21       A.   My full name is Alton Brown.

22       Q.   Where do you live, Mr. Brown?

23       A.   I'm live in Palmers Cross.

24       Q.   What parish is that in?

25       A.   Clarendon.
```

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

5

```
1        Q.    In Jamaica?

2        A.    In Jamaica.

3        Q.    Do you have any plans to be anywhere in the

4    State of Florida in the next year?

5        A.    No, sir.

6        Q.    How old are you today?

7        A.    Well, let me see now.  I am 58, going to be

8    59.

9        Q.    What kind of work do you do now?

10       A.    Well, I do a little farming, raise a little

11   goat and I still do a little building work, which I am

12   doing now.

13       Q.    Did there come a time when you had the

14   opportunity to come to the United States on the farm

15   work program?

16       A.    Sir?

17       Q.    Was there a time when you had the

18   opportunity --

19       A.    Yes, I did.

20       Q.    When was that?

21       A.    I think it was 1982.

22       Q.    What crop did you come up for originally?

23       A.    Well, I went to apple first.  But at Midland

24   Cross Road, I worked with a gentleman called

25   Joe Palidino (phonetic).
```

6

```
 1        Q.   When the apple season was over, did they ask
 2   you if you wanted to come to Florida to cut sugarcane?
 3        A.   Yes, because we actually didn't have much
 4   money there to come home, and they asked me if I would
 5   do the cane.  I did actually refuse at one time, but the
 6   fellow encouraged me; that knowing the type of person I
 7   am, I would make it with the cane.  So I take the advice
 8   and I went.
 9        Q.   What company did you go to work for?
10        A.   Straight to Osceola.
11        Q.   Were you asked back after that first year?
12   Did Osceola ask you to come back to cut cane for them?
13        A.   Well, they definitely didn't just ask me
14   there, because they actually felt like I did well.  So
15   they sent a telegram to me and they requested me back,
16   to come back.
17        Q.   They requested you to come back.
18             How many years did you cut sugarcane for
19   Osceola?
20        A.   Nine years.
21        Q.   What kind of cutter were you?
22        A.   Well, I would say I was a pretty good cutter.
23        Q.   You were a fast cutter?
24        A.   Yes.
25        Q.   Describe for us your day as a cutter; when did
```

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

7

1   it start, what did you do, when did it end.

2        A.   Well, I didn't have any approximate time.

3   When you leave -- at times, you leave at like 7:00 in

4   the morning and then sometimes like 5:00 and sometimes

5   4:00, sometimes up to 6:00.

6        Q.   Would that depend on how far from the camp the

7   field was?

8        A.   No, it didn't depend on that.

9        Q.   What did it depend on?

10        A.   It depends on sometimes the amount of cane.

11   And sometimes they wanted to do a little extra because

12   the extra would help the pushers there because their pay

13   would be a straight pay.  But if they do the overtime,

14   they would have a little extra.

15        Q.   So the times that you're talking about are

16   when you leave the field, not when you leave the camp?

17             MR. VAUGHAN:   Objection.

18   BY MR. GORMAN

19        Q.   Is that right?  When did you leave the camp in

20   the morning?

21        A.   I believe at like -- when it comes to the

22   distance, if sometime we were going far, we would have

23   to leave a little earlier like 6:00, 6:30 if we were

24   going far.

25        Q.   So when you talked about leaving at 4:00, you

561.659.4155  ESQUIRE DEPOSITION SERVICES  800.330.6952

8

1    meant leaving the field at 4:00?

2          A.   Yes, leaving the field at 4:00.

3          Q.   Was there any normal let's-go time at Osceola?

4          A.   Well, generally --

5               MR. VAUGHAN:  Objection.

6               THE WITNESS:  I think they had a time like

7          4:30.  I don't quite remember but I think it was

8          between those times.  Sometimes we would go up to,

9          like, 6:00 and such.

10   BY MR. GORMAN

11         Q.   When you were going out to the field, when you

12   were on the bus as a cutter, did you know what the row

13   price would be?  Did they tell you?

14         A.   No.

15         Q.   How did you learn and when did you learn what

16   the row price would be?

17         A.   When we get to the field.

18         Q.   As soon as you get --

19         A.   Sometimes we started before we even know the

20   prices, so we had to wait until -- certain men had to

21   come and give the field boss the price and then he would

22   come and he would distribute to us and say at this

23   price, this field is for XX.

24         Q.   Now, I understand that every day you would

25   receive a cane ticket that would show the amount of work

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

9

1    that you did, the money you earned and the hours that

2    you worked?

3         A.   Yes, sir.

4         Q.   Were those cane tickets -- did you check them

5    every day yourself to make sure they were accurate?

6         A.   Yes, because I was always anxious to see what

7    I did for the day.  So I would check for mistakes.

8         Q.   Did you find that there were mistakes in the

9    amount of money?

10            MR. VAUGHAN:  Objection.

11            THE WITNESS:  There is vary rare according to

12         the price of the cane that we find there are.  But

13         if there is any mistake, then I would take it back

14         and say, there's an error here, and sometimes they

15         would just say, all right, tomorrow we'll give you

16         back that amount.

17   BY MR. GORMAN

18         Q.   And times what else would they say?

19            MR. VAUGHAN:  Object to form.

20   BY MR. GORMAN

21         Q.   Let's do this:  Did they always agree?

22         A.   Yes, always agree.

23            MR. VAUGHAN:  I'm sorry, I didn't mean to cut

24         you off.  When we ask questions, sometimes the

25         other person will make an objection, and maybe the

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

10

1       person asking the question will want to correct it

2       before you answer it, so that's why I interrupted

3       you.

4           THE WITNESS:  Okay.

5   BY MR. GORMAN

6       Q.   Did you check the hours that were recorded for

7   you every day on your cane tickets?

8       A.   Yes, sir.

9       Q.   Were they always right?

10      A.   No.  That really used to disturb me a lot.

11      Q.   Describe for us what was wrong with the hours.

12      A.   For instance, sometimes like we go out from --

13  we do ten hours for the day, like we're going to 6:00.

14  And then we realize on our ticket, we would have like

15  eight hours.

16      Q.   Did you ever complain to your --

17      A.   Yes.  I always asked him how is this because

18  we do right through the time to that hour and we only

19  get -- they say that's how everybody does it.  That's

20  the norm.

21      Q.   Now, did there come a point in time when you

22  were given the opportunity to become a ticket writer

23  yourself?

24      A.   Yes.  I think it was the two last years that I

25  was there.  I got the opportunity to be a ticket writer.

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

11

1       Q.   How did that opportunity come to you?

2       A.   Well, I used to help out a lot of the men

3    because many of them are not so quick in writing letters

4    and things, and I think they had been watching that as I

5    proceed along, writing for the men and such like.  So

6    they said, I think you could manage to do some ticket

7    writing, you know.  And I even turned it down.  I said,

8    I don't think I can manage it because I never tried to

9    see how -- because having those lot of men to -- you

10   know, I didn't know the rules of it.

11      Q.   You mean having lots of men to --

12      A.   To account to.

13           But anyhow, there was a gentleman there who

14   was a field boss.  His name is Mr. Broom from Barbados.

15   He was a very nice man.  He encouraged me and said,

16   Brown, I believe you can do it.  And he began to show me

17   the ropes.  And then he showed me what to do.

18           And then by the time the project was supposed

19   to begin, I was engaged in it.  I will tell you I went

20   out for the very first morning of that crop with my own

21   crew and the seed cane.

22      Q.   So you began as a ticket writer for a seed

23   cane crew?

24      A.   Seed cane.

25           MR. VAUGHAN:  That's seed cane.

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

60

1            MR. VAUGHAN:  Objection.

2            THE WITNESS:  I think it's about in January.

3            MR. GORMAN:  What was wrong with that, Robert?

4            THE WITNESS:  Either late December to early

5       January.

6            MR. GORMAN:  I'm sorry, you objected.  I'm

7       wondering what was wrong.

8            MR. VAUGHAN:  The objection wasn't to form but

9       it is preserved.  Go ahead.

10  BY MR. GORMAN

11       Q.   Now, you told us that essentially the best

12  cutters were in the seed cane crews?

13       A.   Yes, sir.  That is true.

14       Q.   Were they usually able to make their money

15  every day cutting seed cane?

16       A.   The majority of the time, they made their

17  money.  They always make their money.

18       Q.   This may be clear from some of the questions

19  and answers between you and Mr. Vaughan, but you talked

20  about when the cane bears a lot.  First of all, what

21  that means, as you used the term, bear a lot, that means

22  it's very heavy?

23       A.   Yes.

24       Q.   Did you find that the price of the cane went

25    up the more it bear, the heavier it was usually?

   561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

                                                              61

1        A.    If the price of the cane went up -- well, as I

2    stated before, that sometimes it went up but sometimes

3    it was very low according to the bearing of it.

4        Q.    Mr. Vaughan asked you some questions about

5    filing this lawsuit, and I understand that you're not

6    familiar with the way lawsuits work.

7        A.    That's right.

8        Q.    But did you intend to participate in this case

9    against Osceola Farms Company?  Did you intend to

10   participate in this case against Osceola Farms --

11       A.    That's right.  It is my agreement as long as

12   I -- yeah.

13             MR. GORMAN:  That's all I have.

14             MR. VAUGHAN:  Thank you, Mr. Brown.

15             (Discussion held off the record.)

16             MR. GORMAN:  So let's do this:  We have just

17        concluded the deposition of Mr. Alton Brown.  We're

18        going to begin the deposition of George Larmond.

19        Mr. Larmond is a former ticket writer.  He is not a

20        plaintiff in this lawsuit.

21             It's my understanding that Mr. Vaughan objects

22        to my conducting his deposition and is going to, I

23        guess, not attend.  I intend to proceed with the

24        deposition, but I just want to make clear that both

25      of our positions are on the record before he

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

62

1    leaves.

2         MR. VAUGHAN:  For the Defendant, Osceola, we

3    object to the purported deposition as not properly

4    noticed.  Mr. Larmond is not a party to the

5    lawsuit.  There is no indication as to what witness

6    or witnesses Mr. Larmond is purporting to give

7    testimony on behalf of.

8         Accordingly, since the purported class of

9    plaintiffs has been denied certification and

10   Osceola believes that there are, in effect, several

11   small individual cases, as of this moment

12   Mr. Larmond is not properly noticed as a witness in

13   any one of those cases.

14        MR. GORMAN:  Just to make sure it's clear, the

15   notice reflects that it is taken on behalf of

16   Alphonso Mitchell, et al.  So to the extent it's

17   necessary that Mr. Larmond be noticed in connection

18   with any one or more of the plaintiffs, the

19   Defendant may assume that he is noticed in

20   connection with all of the plaintiffs.

21        He is a third-party fact witness.  He is not

22   testifying as an advocate on anyone's behalf.

23        MR. VAUGHAN:  Thank you.

24        (Witness excused.)

25          (Deposition was concluded.)

    561.659.4155  ESQUIRE DEPOSITION SERVICES  800.330.6952

                                                        63

1                    CERTIFICATE OF OATH

2   THE STATE OF FLORIDA

3   COUNTY OF PALM BEACH

4

5

6           I, the undersigned authority, certify that

7   ALTON BROWN personally appeared before me and was duly

8   sworn.

9

10          Dated this 12th day of January, 2006.

11

12

13

14

15   _____

     Jeana Ricciuti, RPR
16   Notary Public – State of Florida
     My Commission Expires:  2/17/2009
17   My Commission No.:  DD 397720

18           Job #13033

19

20

21

22

23

24

25

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

64

1                    C E R T I F I C A T E

2    THE STATE OF FLORIDA

3    COUNTY OF PALM BEACH

4

5            I, Jeana Ricciuti, Registered Professional
     Reporter and Notary Public in and for the State of
6    Florida at large, do hereby certify that I was
     authorized to and did report said deposition in
7    stenotype; and that the foregoing pages are a true and
     correct transcription of my shorthand notes of said
8    deposition.

9            I further certify that said deposition was
     taken at the time and place hereinabove set forth and
10   that the taking of said deposition was commenced and
     completed as hereinabove set out.

11

12           I further certify that I am not attorney or
     counsel of any of the parties, nor am I a relative or
     employee of any attorney or counsel of party connected
13   with the action, nor am I financially interested in the
     action.

14

15           The foregoing certification of this transcript
     does not apply to any reproduction of the same by any
     means unless under the direct control and/or direction
16   of the certifying reporter.

17           Dated this 12th day of January, 2006.

18

19

20

21   _____
     Jeana Ricciuti, RPR

22
     Job #13033

23

24

25

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2

 3                 WEST PALM BEACH DIVISION

 4             CASE No.05-80825-CI-COHN/SNOW

 5
     ALPHONSO MITCHELL, et al.,
 6
              Plaintiffs,
 7   -vs-

 8   OSCEOLA FARMS COMPANY,

 9            Defendant.
     _____
10

11

12            DEPOSITION OF HERMAN CAMPBELL

13
                 Thursday, January 12, 2006
14                    12:25 - 1:10 p.m.

15

16

17                 17 Da Costa Drive
                   Ocho Rios, Jamaica
18

19

20

21   Reported By:
     Jeana Ricciuti, RPR
22   Notary Public, State of Florida
     Esquire Deposition Services
23   West Palm Beach Office   Job #

24

25
```

561.659.4155  ESQUIRE DEPOSITION SERVICES  800.330.6952

2

```
1    APPEARANCES:

2    On behalf of the Plaintiffs:

3         DAVID L. GORMAN, ESQUIRE
          DAVID L. GORMAN,P.A.
4         618 US Highway One
          Suite 303
5         North Palm Beach, Florida  33408
          Phone: 561.842.0808
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

3

```
 1                        -   -   -
                         I N D E X
 2                        -   -   -

 3

 4    WITNESS:          DIRECT    CROSS    REDIRECT    RECROSS

 5    HERMAN CAMPBELL

 6

 7    BY MR. GORMAN        4

 8

 9

10                        -   -   -   -
              N O   E X H I B I T S   M A R K E D
11                        -   -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

4

```
 1                  P R O C E E D I N G S

 2                        - - -

 3        Deposition taken before Jeana Ricciuti, Registered

 4   Professional Reporter and Notary Public in and for the

 5   State of Florida at Large, in the above cause.

 6                        -  -  -

 7   Thereupon,

 8                    (HERMAN CAMPBELL)

 9   having been first duly sworn or affirmed, was examined

10   and testified as follows:

11                    DIRECT EXAMINATION

12   BY MR. GORMAN

13        Q.   Would you tell us your full name, please.

14        A.   Herman Campbell.

15        Q.   Where do you live, sir?

16        A.   I live in Banbury.

17        Q.   And where is Banbury?

18        A.   In Linstead, St. Catherine.

19        MR. VAUGHAN:  On the record, I assume, David,

20        that you're going to just get the background

21        information, just the background on Mr. Campbell,

22        and then allow me to move on.

23        MR. GORMAN:  I'm just going to go through it

24        because anything you want to do on voir dire I'm

25        going to do on direct anyway.
```

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

5

1          MR. VAUGHAN:  No.

2          MR. GORMAN:  Yes.

3          MR. VAUGHAN:  Well, I'm going to do the voir

4     dire now.

5          MR. GORMAN:  No, you're not.  This is my

6     deposition.  It's been noticed.  I'm going to ask

7     this gentleman very few questions about who he is,

8     what his background was and illicit the testimony

9     that's relevant, I believe, to this case.

10         MR. VAUGHAN:  For the record, we do not

11    believe that Mr. Campbell has been properly noticed

12    for this case.  Mr. Campbell is not a party or a

13    potential party based upon your motion for leave to

14    add plaintiffs.

15         You have stated that you are not going to give

16    us an opportunity on the record to voir dire the

17    witness briefly to determine if the deposition

18    should properly continue.  And if that is your

19    position, we have no choice but to terminate the

20    deposition and seek relief from the judge.  If

21    you're not going to allow me to voir dire the

22    witness to find out if he should properly be

23    deposed, we're going to terminate our participation

24    in the deposition.

25         MR. GORMAN:  This is a deposition I'm taking

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

6

```
1        for use at trial of a witness who lives outside of
2        the country.  I intend to proceed with the
3        examination.  If you choose to leave, so be it.
4            I have told you, and I do agree he is not a
5        party, but the notice clearly identified him as a
6        witness.  It is in the name of the Plaintiffs,
7        Alphonso Mitchell, et al.  I'm unaware of anything
8        which would disable him from testifying here.
9            MR. VAUGHAN:  I'm sorry, are you done?
10            MR. GORMAN:  Yes.
11            MR. VAUGHAN:  This action is not a class
12        action.  It has been decertified -- or
13        certification has been denied by the court.
14        Accordingly, each one of the individual plaintiffs,
15        and I would even give you for purposes of the
16        deposition and to be generous, I would even give
17        you the plaintiffs that you are seeking leave to
18        join in their individual capacities.  Mr. Herman
19        Campbell is not one of those individuals.
20            As of this point, we don't know on whose
21        behalf Mr. Herman Campbell is here to testify so we
22        cannot proceed.  We have not been given any notice.
23        I think it creates a new process issue, it creates
24        a preparation issue for the Defendant and we cannot
25        proceed with the deposition if you won't allow me
```

7

1          an opportunity to voir dire.

2              MR. GORMAN:  No.  Just to be clear,

3          Mr. Campbell is not here on anyone's behalf.  He is

4          here to testify to facts which he knows.

5              MR. VAUGHAN:  So he's not --

6              MR. GORMAN:  He's not an advocate, he's a

7          witness.

8              MR. VAUGHAN:  He's not a witness for any one

9          of the plaintiffs?

10             MR. GORMAN:  He's not an advocate.  Facts to

11         which he testifies may assist the Plaintiffs or

12         hurt the Defendant, but he is here just to testify

13         truthfully to the things that he knows about what

14         went on during the years that he worked as a ticket

15         writer and lead man at Osceola.

16             MR. VAUGHAN:  And you will not allow me to

17         voir dire the witness to find out in which one of

18         these particular individual cases he's here for?

19             MR. GORMAN:  There are no individual cases.

20         If can you give me a case number other than the one

21         of which I'm aware, then we have something to talk

22         about. I'm only aware of one case pending and

23         that's number 05-80825-CIV Cohn/Snow.  I'm not

24         aware of any other case.  And to my knowledge,

25         every one of the Plaintiffs is a party to that

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

8

 1    case.  This deposition has been noticed in that

 2    case.  He's a third party witness who has traveled

 3    at some considerable inconvenience to himself to

 4    come up and offer what testimony he can.

 5         MR. VAUGHAN:  Again, so have we.  We have

 6    traveled at considerable expense to come to the

 7    depositions, and we don't know on whose's behalf he

 8    is going to be giving testimony and we cannot

 9    proceed.

10         MR. GORMAN:  All right.  So are you leaving?

11         MR. VAUGHAN:  If you're going to call the next

12    witness.

13         MR. GORMAN:  The next witness will be

14    precisely the same at this witness, Charles Bryan.

15         MR. VAUGHAN:  Are you going to have it on the

16    record?

17         MR. GORMAN:  Charles Bryan is the next

18    witness.  He is not a party.  He has been noticed

19    in this case.  He was a ticket writer and then a

20    lead man or a pusher, as they are more commonly

21    known.  He will testify to what he knows about the

22    time keeping procedures at Osceola during the

23    relevant years.  In fact, he signed as the ticket

24    writer, I believe, on both of the cane tickets

25          which are marked as our Exhibit No. 1 along with

     561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

                                                              9

1          his pusher, Mr. Lawton.
2              MR. VAUGHAN:  And I'm presuming the facts, as
3          you've stated, to be the same for both Mr. Bryan
4          and Mr. Campbell, it also means that Mr. Bryan is
5          not here on behalf of any one of the plaintiffs but
6          purports to be giving testimony on behalf of the
7          punitive class which has been denied certification.
8              MR. GORMAN:  No, sir.
9              MR. VAUGHAN:  We have not been given notice as
10         to which one of these individual plaintiffs or
11         which number of them purports to be giving
12         testimony on behalf of.  Accordingly, we cannot
13         proceed.
14             For the record, we'll also note that our
15         objection to the depositions in total have been or
16         will be filed since we don't believe that the
17         notice was properly given since it was noticed in
18         the middle of my absence of the jurisdiction.  We
19         were not provided with ample opportunity to file a
20         motion for protective order.  Of course, we will
21         deal with that at a later point in time.
22             MR. GORMAN:  You are right, we will.  The
23         notice however also was sent to Joseph Clock, your
24         partner, and to Mr. Lopez, who is here with us.  I

25      can't tell you what took place when it arrived at

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

10

1      your offices, but it was sent both by facsimile and

2      by regular mail, and it followed a letter which I

3      faxed to you on December the 15th notifying you

4      that these dates would be used in this general

5      location for depositions, and to let me know if

6      there was a problem.

7          Be that as it may.  So that you are clear,

8      this is a fact witness.  Mr. Bryan is a fact

9      witness.  They are not here as advocates.  They are

10     not here as experts.  They will testify as to what

11     they know as to what took place.  They are not

12     testifying on behalf of any one individual.  So I

13     guess that makes our choices and takes our chances.

14         MR. VAUGHAN:  That's on the record?

15         MR. GORMAN:  Yes.

16         MR. VAUGHAN:  Makes our choices and takes our

17     chances.

18         MR. GORMAN:  That's what you're doing.

19         MR. VAUGHAN:  I think it's grammatically

20     incorrect.

21         MR. GORMAN:  Probably.

22         MR. VAUGHAN:  We will proceed as we have

23     stated.

24         MR. GORMAN:  So you're leaving?

```
25            MR. VAUGHAN:  Yes, we are leaving.
```

       561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

                                                                11

```
 1            MR. GORMAN:  Then let's do something.  Let me
 2       check and see if I can answer the question
 3       regarding tomorrow's guys.  My recollection is one
 4       of them is a party, one of them is --
 5            MR. VAUGHAN:  Mr. Brown is okay.
 6            MR. GORMAN:  Okay meaning you think he was a
 7       party?
 8            MR. VAUGHAN:  Mr. Brown is either named in the
 9       complaint or he is one of the people you seek to
10       have named, and we will grant that courtesy because
11       there is a good faith basis to proceed assuming
12       that he will remain a party.
13            MR. GORMAN:  He cut in '87, '88.
14            MR. VAUGHAN:  He's named or in your motion for
15       relief to add so we will proceed with him.
16            MR. GORMAN:  All right.
17            MR. VAUGHAN:  Mr. Campbell, my apologies,
18       sir --
19            MR. GORMAN:  He's not leaving yet because I am
20       going to proceed.  It may or may not ever be
21       usable.
22            MR. VAUGHAN:  I can't stop you.
23            MR. GORMAN:  I know.
```

24          MR. VAUGHAN:  My apologies, sir, on behalf of

25          the Defendant.  At this particular point in time

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

12

1          because of legal objections that we have, we cannot

2          proceed.  I hope we will have another opportunity

3          to speak to you.

4          MR. GORMAN:  All right then.  You get to go

5          back.

6          (Thereupon, Mr. Vaughan and Mr. Lopez exited

7   the proceeding.)

8   BY MR. GORMAN

9          Q.   I think the last question that I asked was

10   where did you live and you told us you lived in Banbury,

11   which is in Linstead, St. Catherine.  St. Catherine is a

12   parish on the Island of Jamaica; is that correct?

13          A.   Yes.

14          Q.   And I'll first ask you if you have any plans

15   to be anywhere in the State of Florida within the next

16   year?

17          A.   I don't think so because I haven't got a

18   passport.  Unless the central government wants me to,

19   I'll go to New York.  I might pass by.

20          Q.   But you don't have any plans to be there?

21          A.   No, no plans at all.

22          Q.   Tell us how old you are.

23          A.   I'm 70.

24      Q.   And where were you born?

25      A.   I was born in Portland in Jamaica, West


561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952


                                                    31


1                    CERTIFICATE OF OATH

2    THE STATE OF FLORIDA

3    COUNTY OF PALM BEACH

4

5

6            I, the undersigned authority, certify that

7    HERMAN CAMPBELL personally appeared before me and was

8    duly sworn.

9

10           Dated this 12th day of January, 2006.

11

12

13

14           _____

15

     Jeana Ricciuti, RPR
16   Notary Public - State of Florida
     My Commission Expires:  2/17/2009
17   My Commission No.:  DD 397720

18           Job #

19

20

21

22

23

24

25

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

32

1                    C E R T I F I C A T E

2    THE STATE OF FLORIDA

3    COUNTY OF PALM BEACH

4

5            I, Jeana Ricciuti, Registered Professional
     Reporter and Notary Public in and for the State of
6    Florida at large, do hereby certify that I was
     authorized to and did report said deposition in
7    stenotype; and that the foregoing pages are a true and
     correct transcription of my shorthand notes of said
8    deposition.

9            I further certify that said deposition was
     taken at the time and place hereinabove set forth and
10   that the taking of said deposition was commenced and
     completed as hereinabove set out.
11
             I further certify that I am not attorney or
12   counsel of any of the parties, nor am I a relative or
     employee of any attorney or counsel of party connected
13   with the action, nor am I financially interested in the
     action.
14
             The foregoing certification of this transcript
15   does not apply to any reproduction of the same by any
     means unless under the direct control and/or direction
16   of the certifying reporter.

17           Dated this 12th day of January, 2006.

18

19

20

21   _____
     Jeana Ricciuti, RPR
22

```
            Job #
23

24

25
```

561.659.4155   ESQUIRE DEPOSITION SERVICES   800.330.6952

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT, IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO.  CL-89-8690-AI

BERNARD BYGRAVE, CANUTE WILLIAMS,
EPHRAIM MORRISON, JAMES BOYDE,
KENROY CAMPBELL, HENRY JACKSON,
ADOLPHUS GORDON AND MIGEL MCKELLAR,
on behalf of themselves and all others similarly
situated,

      Plaintiffs,

vs.

SUGAR CANE GROWERS COOPERATIVE,
INC., a Florida corporation, ATLANTIC SUGAR
ASSOCIATION, INC., OKEELANTA CORPORATION,
OSCEOLA FARMS CO., AND CANE
CONTRACTORS, INC.,

      Defendants.

_____/

## AFFIDAVIT OF ROBERT C.L. VAUGHAN

STATE of FLORIDA        )
                    ) S.S.
COUNTY of DADE  )

    I, ROBERT VAUGHAN, being duly sworn, deposes and says as follows:

    1.     The statements contained in this affidavit are true and correct and based upon my

personal knowledge.

    2.     I was born and raised in Jamaica.  I completed my legal education at New York

University school of Law where I graduated in 1997.  In September of that same year, I was

admitted to the Florida Bar and began work as an Associate at Steel Hector & Davis LLP

Case No. CL 89-8690 AI

("SH&D").  In July of 1998, I resigned from SH&D and moved back to Jamaica where I began a

program of study to be admitted to the Jamaican Bar.  During that time, I have been retained to

provide contract services to SH&D with respect to its work on a number of cases currently

pending in Florida courts.  I intend to return to SH&D in April of this year when my program in

Jamaica is completed.

      3.     One of the tasks I had been asked to complete involved locating, interviewing, and

later making preparations for the depositions of ticket-writers and lead men who were available

and had information relevant to the trial of the pending sugar cane cases in Florida.  I was told by

attorneys at SH&D, and did understand, that I was not to speak to members of the plaintiff class.

      4.     In preparing for these depositions, it was necessary that I first hire a team of local

investigators in Jamaica, who coordinated locating and confirming current addresses, if available,

for these ticket-writers and lead men.  I instructed the investigators never to discuss the specifics

of the case with anyone they located.

      5.     After establishing current addresses for each ticket-writer and lead man, I then

attempted to personally visit and interview each person, as most of these individuals did not have

access to residential telephone service.

      6.     During these interviews with the ticket-writers and lead men, I did not knowingly

speak to any member of the plaintiff class.  I did have one brief conversation with a Mr. Cyril

Barrett who was placed on our list of potential interviewees after correspondence with Mr.

Gorman's office confirmed that Mr. Barrett was not a member of the plaintiff class. Attached as

-2-

Case No. CL 89-8690 AI

"Exhibit A," is a copy of Mr. Gorman's letter listing the names of the class members with a listed residence in Jamaica. Mr. Barrett's name is not on this list.

7.     As soon as Mr. Barrett indicated that he may have been a cutter during the 1988-89 season, I explained to him the rules prohibiting me from speaking to him further about the case if he was in fact a member of the class and immediately terminated the conversation. Mr. Barrett asked me for a ride to visit a friend in the area and I did not want to seem rude to Mr. Barrett so I agreed to his request. I did not speak to him about the case during this ride. I thanked him for his time and promised to contact him if I confirmed that he was not, in fact, a member of the class. I have had no further discussion with Mr. Barrett.

8.     When I was informed which of ticket-writers and lead men were to be deposed, it was again necessary that someone visit each of the proposed deponents so that they could be informed of the dates of the planned depositions and made aware of any travel and/or accommodation arrangements which could be made on their behalves.

7.     It was my understanding, that in addition to assisting SH&D to produce witnesses for Atlantic's witness list, Atlantic's lawyers had also offered assistance in getting the Plaintiffs' witnesses to the deposition locations. I understood that this was done because previous attempts to depose the plaintiffs' witnesses (in the McDonald case) had proven extremely time consuming and wasteful because some of the witnesses failed to show up at the appointed time and place to have their depositions taken.

8.     With a little under one week to inform the potential deponents of their deposition dates, confirm travel arrangements, and make hotel arrangements for almost forty deponents as

-3-

Case No. CL 89-8690 AI

well as arrange for deposition space in two separate locations across the island and then ultimately transport all these men from their respective homes to the deposition locations, I unilaterally decided to write a very basic letter to the deponents primarily to serve as an introduction of the bearers who were hired to inform the men about the depositions and tell them about the arrangements I had made for their transportation and accommodations.

9.     To me, the decision to write this letter was purely logistical, which is why I never sought advice from any of the attorneys at SH&D or Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, nor thought that such advice was necessary.

10.     I never intended to mislead any of the potential deponents, neither Defendants' nor Plaintiffs' witnesses, who incidentally all received similar letters.  Neither did I intend to communicate anything other than transportation arrangements to these men.  **At no time did I personally speak to any plaintiffs' witness named on the deposition notice.  I also specifically instructed the drivers and investigators not to engage in any conversation about the case with any person listed on the plaintiffs' witness list.  To the best of my knowledge, the investigators and drivers complied with all my instructions.**

11.     I realize now that my letter, despite its innocent intent, may have violated a prior court order prohibiting contact with class members without the presence of opposing counsel. My sole motivation for sending the letter in question, was to ensure that the planned depositions were executed without undue waste of time or expense to either side.

-4-

Case No. CL 89-8690 AI

12.     I offer my most sincere apologies to the court for any appearance of impropriety and repeat my assurances that at no time were there any discussions about any issues involved in the case with any member of the plaintiff class.

ROBERT C.L. VAUGHAN

I hereby certify that on this 31 day of April, 1999, personally appeared ROBERT VAUGHAN, who is personally known to me ~~or who produced the following identification~~ _____, and acknowledged before me that he executed the foregoing document as his free act and deed who did/did not take an oath.

In Witness Whereof, I have hereunto set my hand and seal in the County and State aforesaid as of this 31 day of April, 1999.

Notary Public
State of Florida
Commission No.:
My Commission Expires:

MIA_1998/485810-1

-5-